# EXHIBIT A

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**DREW STERRETT,**

      Plaintiff,

vs.

**HEATHER COWAN, JAY WILGUS,
STACY VANDER VELDE, THEODORE
SPENCER, SUSAN PRITZEL,  MIKIKO
SENJA, E. ROYSTER HARPER,  MALINDA
MATNEY, ANTHONY WALESBY** and **LAURA
BLAKE JONES,** *employees of the University of
Michigan, sued in his or her personal and official
capacities, jointly and severally,* and the
**REGENTS OF THE UNIVERSITY OF
MICHIGAN,**

      Defendants.

Case No. 2014-CV-11619
Hon.  Denise Page Hood
Mag. Michael J. Hluchaniuk

| | |
|---|---|
| **DEBORAH GORDON LAW**<br>**Gordon, Laughbaum & Prescott**<br>**Deborah L. Gordon (P27058)**<br>**Carol A. Laughbaum (P41711)**<br>Attorneys for Plaintiff<br>33 Bloomfield Hills Parkway, Suite 220<br>Bloomfield Hills, Michigan 48304<br>Telephone 248 258 2500<br>dgordon@deborahgordonlaw.com<br>claughbaum@deborahgordonlaw.com | **MILLER CANFIELD PADDOCK &**<br>**STONE, P.L.C.**<br>**Thomas W. Cranmer (P25252)**<br>**David O'Brien (P65532)**<br>**Paul Hudson (P69844)**<br>Attorneys for Defendants Cowan,<br>Wilgus, Velde, Spencer, Pritzel,<br>Harper, Matney, Walesby & Blake<br>Jones<br>840 West Long Lake Road, Suite 200<br>Troy, Michigan 48098<br>(248) 879-2000<br>cranmer@millercanfield.com<br>hudson@millercanfield.com |

# FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Drew Sterrett by his attorneys Deborah Gordon Law complains against Defendants as follows:

## Claim, Jurisdiction and Parties

1.     This is an action for due process violations under the Fourteenth Amendment to the United States Constitution, for free speech violations under the First Amendment to the United States Constitution brought pursuant to 42 U.S.C. §1983, and for sex discrimination under Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §1681, et seq., 34 C.F.R. §106.31 and the Elliot Larsen Civil Rights Act, MCLA 37.2402.

2.     Plaintiff Drew Sterrett (hereafter "Plaintiff" or "Plaintiff Sterrett") is a former student at the University of Michigan. Sterrett's claims arise out of the disciplinary and other action taken against him by Defendants on the basis of alleged "sexual misconduct" and specifically the utter lack of due process afforded him prior to being deprived of his protected liberty and property interests.

3.     Plaintiff never engaged in any "sexual misconduct" whatsoever. The allegation was false and there was never evidence sufficient to support a finding against Plaintiff.

4.     Plaintiff Sterrett is a resident of New York.

2

5.   Defendant Heather Cowan (hereafter "Defendant Cowan") is or was at pertinent times an Equal Opportunity Specialist at the University of Michigan and upon information and belief resides in the Eastern District of Michigan.

6.   Defendant Jay Wilgus (hereafter "Defendant Wilgus") is or was at pertinent times the Director, Office of Student Conflict Resolution (OSCR) at the University of Michigan and upon information and belief resides in the Eastern District of Michigan.

7.   Defendant Stacy Vander Velde (hereafter "Defendant Vander Velde") is or was at pertinent times Associate Director, Office of Student Conflict Resolution at the University of Michigan and upon information and belief resides in the Eastern District of Michigan.

8.   Defendant Theodore Spencer (hereafter "Defendant Spencer") was at pertinent times a member of the Appeals Board at the University of Michigan considering Plaintiff's appeal of the disciplinary action taken against him and upon information and belief resides in the Eastern District of Michigan.

9.   Defendant Susan Pritzel (hereafter "Defendant Pritzel") is or was at pertinent times a member of the Appeals Board at the University of Michigan considering Plaintiff's appeal of the disciplinary action taken

3

against him and upon information and belief resides in the Eastern District
of Michigan.

10.     Defendant Mikiko Senja (hereafter "Defendant Senja") is or was at pertinent
        times a member of the Appeals Board at the University of Michigan
        considering Plaintiff's appeal of the disciplinary action taken against him
        and upon information and belief resides in the Eastern District of Michigan.

11.     Defendant E. Royster Harper (hereafter "Defendant Harper") is or was at
        pertinent times Vice President for Student Affairs at the University of
        Michigan and upon information and belief resides in the Eastern District of
        Michigan.

12.     Defendant Malinda Matney (hereafter "Defendant Matney") is or was at
        pertinent times a Resolution Officer at The University of Michigan and upon
        information and belief resides in the Eastern District of Michigan.

13.     Defendant Anthony Walesby (hereafter "Defendant Walesby") is or was at
        pertinent times Senior Director, Office for Institutional Equality (OIE),
        Associate Provost for Academic and Faculty Affairs, OSCR Director and
        Title IX Coordinator at the University of Michigan and as such had
        responsibility for oversight of the "sexual misconduct" investigation
        findings, and upon information and belief resides in the Eastern District of
        Michigan.

14. Defendant Laura Blake Jones (hereafter "Defendant Jones") is or was at pertinent times Dean of Students at The University of Michigan and upon information and belief resides in the Eastern District of Michigan.

15. The above named individuals are sued both in their personal and official capacities.

16. The Regents of the University of Michigan have general supervision of the institution pursuant to the Michigan Constitution of 1963.

17. The events underlying this Complaint occurred in Ann Arbor, Michigan, within the Eastern District of Michigan.

18. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 and 20 U.S.C. §1681.

## Background Facts

### Plaintiff Attends the University of Michigan

19. Plaintiff Sterrett was born in October, 1992.

20. In the Fall of 2011, Plaintiff began his freshman year as an undergraduate student at the University of Michigan, School of Engineering.

21. Plaintiff was also admitted to the Michigan Research Community (MRC), a "learning community" offering incoming students a research partnership with a faculty member and the ability to be part of a community of other like-minded University of Michigan students.

5

22.  As part of MRC, Plaintiff lived on campus with other MRC students in the Mosher-Jordan Residence Hall.

23.  Plaintiff was assigned a roommate, Z.L., whom he had not known previously.  Plaintiff made many friends and was well thought of by his fellow students and MRC members.

24.  Prior to these events, Plaintiff had an excellent reputation, zero involvement with law enforcement and conducted himself in a manner that was completely respectful of women at all times.

25.  In May of 2012, Plaintiff successfully completed his freshman year and left Ann Arbor for the summer.

### On August 6, 2012 Plaintiff Learns in a Phone Call From the University That an Unspecified Verbal Complaint Has Been Made Against Him by a Fellow Student

26.  On August 6, 2012, Plaintiff was contacted in New York to set up an interview later that day with Defendant Heather Cowan, then Program Manager, University of Michigan Office of Student Conflict Resolution (OSCR), regarding an undefined student complaint against him.  Plaintiff agreed.

27.  A few hours later, Defendant Cowan called Plaintiff as scheduled and began interviewing him via the audio/video remote hook-up Skype. Present with Cowan was Keith Mowers, Assistant Director, University Housing.

28. Defendant Cowan failed to give Plaintiff notice of what the allegations against him entailed and instead simply began asking questions.

29. Early in the call/interview, Plaintiff inquired as to whether he could or should consult legal counsel and postpone the interview.

30. Plaintiff was advised that if he put off the interview, that fact would be reported to the University, that Defendant Cowan's investigation would continue without his input, and that in any event decisions would be made in the next several days.

31. Under pressure and given the representations made to him, but with no notice of the specific charges or complaint against him, Plaintiff agreed to proceed.

32. At no point during the call/interview was Plaintiff given notice of the specific allegations which had been made against him. Instead, Plaintiff eventually gleaned that it involved unspecified sexual misconduct allegations made by a fellow MRC member and friend, C.B. (Complainant) with whom Plaintiff had had consensual sex on one occasion, in Plaintiff's dorm room, approximately five months earlier. Plaintiff learned that Complainant had made a verbal complaint to Cowan and that Cowan was also assigned to "investigate."

**During the Phone Interview on August 6, 2012, Plaintiff Was Completely Cooperative and Provided Truthful Information**

7

33.   During the phone interview, Plaintiff provided information, including but
      not limited to the following (the truth of most of these statements made by
      Plaintiff are uncontested by Defendants, as noted):

   a.   The sexual encounter at issue occurred in a bunk bed in Plaintiff's
        dorm room.  At all times pertinent, Plaintiff and Complainant were in
        the lower bunk bed, while Plaintiff's roommate, Z.L., a friend of
        Complainant, was in the upper bunk bed, directly above them.
        [uncontested]

   b.   Plaintiff had known Complainant since the beginning of their
        freshman year.  They both were members of the MRC and friends.
        They lived on the same floor in the Mosher-Jordan Residence Hall
        and shared many of the same friends. They had "made out" prior to
        March 17, 2012. [uncontested]

   c.   On the night of March 16, 2012 Plaintiff returned to his dorm room
        after having been out. Complainant was already present in the room
        accompanied by other friends, including Plaintiff's roommate, Z.L.
        Plaintiff was not intoxicated. [uncontested]

   d.   The group socialized.  Complainant stated that she was not going to
        sleep in her room, which was on the same floor, because her
        roommate had company.  At least one of Complainant's friends
        present offered to have Complainant stay in his/her room.
        Complainant decided to stay in Plaintiff's room.  Plaintiff and his
        roommate had a mat available for overnight guests to sleep on.
        [uncontested]

   e.   Plaintiff and his roommate shared a bunk bed; Plaintiff slept on the
        bottom and Z.L. slept on the top bunk. [uncontested]

   f.   Complainant's friends left the room. Complainant did not leave with
        them.  She remained.  Plaintiff's roommate got into the upper bunk to
        go to sleep. [uncontested]

g.    Plaintiff laid down on his lower bunk bed. Complainant laid down next to Plaintiff in his bed. Plaintiff was on the inside (the side against the wall) of the bed, Complainant was on the other (open) side of the bed. [underline]uncontested[/underline]

h.    Plaintiff was surprised that Complainant got into bed with him and had not expected that.

i.    Once in bed, Plaintiff and Complainant talked and then began kissing. The kissing was consensual. [underline]uncontested[/underline]

j.    Complainant asked Plaintiff to put on a condom; he retrieved one from a drawer and did so. Plaintiff and Complainant engaged in sexual intercourse. [underline]uncontested[/underline]

k.    Complainant was an active participant in the sexual intercourse, which lasted 30-45 minutes.

l.    The sexual encounter was completely consensual at all times.

m.    If Complainant had not made clear to Plaintiff that she wanted to have sexual intercourse with him, it would not have occurred.

n.    Complainant never said "no" and never pushed or attempted to push Plaintiff away.

o.    Complainant never got up or attempted to get up from the bed, and never attempted to leave the room. [underline]uncontested[/underline]

p.    Complainant was aware that Plaintiff's roommate, Z.L., also a friend of hers, was in the upper bunk directly above them. At no point did Complainant attempt to speak to or otherwise reach out to Z.L. [underline]uncontested[/underline]

q.    Plaintiff and Complainant conversed after having sex. Complainant spent the rest of the night in Plaintiff's room. [underline]uncontested[/underline]

r.    At no time did Complainant ever tell Plaintiff that the sexual encounter had been anything but consensual. [underline]uncontested[/underline]

s.    Before leaving Plaintiff's room the next morning, Complainant said, "let's keep this to ourselves." Plaintiff agreed.

t.    At 10:46 a.m. on March 17, 2012 after Complainant left the room, she texted to Plaintiff, "You actually can't tell anyone." Plaintiff responded "I won't." [uncontested]

u.    Plaintiff and Complainant both felt awkward about the sexual encounter because they were friends. Plaintiff believed Complainant was embarrassed about having had sex with him.

v.    Later that morning, Plaintiff's roommate, Z.L., expressed irritation with Plaintiff for having engaged in sexual activity the prior night, with Z.L. in the room, complaining to Plaintiff that Plaintiff and Complainant had been loud, keeping him awake. [uncontested]

w.    Plaintiff and Complainant continued to reside on the same floor in the same residence hall together as members of the MRC until the end of that school year in May, 2012. [uncontested]

x.    Between the time of the sexual encounter and the end of the school semester Complainant never stated to Plaintiff that their sexual encounter had not been consensual. [uncontested]

**Additional Uncontested Facts, Known to Defendants**

34.   The following additional relevant facts are uncontested by Defendants:

a.    On March 17, 2012, during the sexual encounter, from his upper bunk, Plaintiff's roommate Z.L. sent Plaintiff the following Facebook message at 3:19 a.m. EST:

"Dude, you and [Complainant] are being abnoxtiously(sic) loud and inconsiderate, so expect to pay back in full tomorrow. I only don't say anything now so I don't embarrass you all, but I'm rightfully pissed. Yours Truly"

b.    At no time during the investigation by Defendant Cowan was Complainant asked, nor did she address 1) why she did not say "no" or anything else in a voice loud enough to attract the attention of the

        roommate right above them; or 2) why she did not get up and leave the bed or the room until the next morning.

c.     Complainant kept a diary which included an account of her sexual encounter(s) and other activities she engaged in.  According to one witness, her mother found her diary in July, 2012.  Complainant never explained and has never been asked by Defendants why she withheld its existence or what was said in the diary.

d.     Complainant never contacted the police or any law enforcement entity of any kind at any time regarding Plaintiff; nor did Cowan, Wilgus or anyone else from the University after they learned of the complaint.

**Significant Due Process Violations Began at the Onset**

35.    On August 2, 2012, Complainant contacted the University of Michigan Office of Institutional Equity (OIE) and made a verbal complaint of what Defendants call "sexual misconduct" to Defendant Heather Cowan, who met with Complainant and purportedly took notes of her allegations. There is no written documentation of the content of the charge or complaint made against Plaintiff on that date; the contemporaneous notes made by Cowan were never provided to Plaintiff.

36.    Plaintiff was never given notice of the charges against him.

37.    As described above, prior to being interviewed on August 6, 2012, Plaintiff was never provided with a written statement of the allegations against him; nor was he ever advised verbally of the allegations against him.

38.    In fact, Complainant has never filed a written complaint against Plaintiff with Defendants.

39.   Complainant has never created written documentation of her allegations against Plaintiff.

40.   Complainant has never signed her name to any statement or complaint brought against Plaintiff by the University.

41.   Cowan subsequently created a purported "summary" of what Complainant verbally told her on August 2, 2012.  During the phone interview of August 6, 2012, Plaintiff was advised that he would have the opportunity to review that summary.  But, because Complainant had not agreed to let Plaintiff have a copy of the interview summary, he was not provided with a copy for over two months, after the investigation was over.

42.   At the end of the interview on August 6, 2012, Plaintiff was instructed by Cowan and Mowers that he should not talk to any potential witness about the complaint, and that the matter was "confidential."   Plaintiff specifically was told not to speak to his former roommate, Z.L., the "most important witness" per Cowan.

43.   Plaintiff was never provided with the names of witnesses Cowan was talking to.

44.   Because of Defendant Cowan's directives, with which Plaintiff complied, and without seeing the allegations against him, Plaintiff's ability to marshal evidence to fully defend himself was cut off and important, exculpatory

evidence was left unearthed for months, until *after* Defendant Cowan made a decision against Plaintiff.   At that time, Plaintiff began collecting sworn statements from witnesses in order to correct the record and bring forward the truth.   Those statements correcting the record and presenting new evidence were essentially ignored by Defendants.

45.   It is uncontested that Complainant's mother did contact at least two potential witnesses and gave them instructions. One of those witnesses has affirmed that she was "harassed" by the mother.

46.   The University's policy and procedure required that Plaintiff be presumed not to have engaged in wrongdoing.   This presumption was disregarded by Defendants.   From the day of the complaint Defendants presumed that Plaintiff had engaged in sexual misconduct and proceeded in accordance with that assumption.

47.   It is uncontested that Plaintiff has never posed any threat of any kind to Complainant or anyone else.   He lived on the same floor in the same residence hall with the Complainant for several months after the sexual encounter with no issues of any kind, and without Complainant reporting any problems, much less that he was a threat. There is no record that Complainant ever told any Defendant that she was afraid of Plaintiff in any way.

48.   Nevertheless, prior to his being interviewed on August 6, 2012, the University made a decision to remove Plaintiff from the Mosher-Jordan Residence Hall because the Complainant resided there.

49.   Plaintiff was advised during the August 6, 2012 call that it was required that he be removed.  That was untrue; there was no such requirement.

50.   Because he was being removed from the Residence Hall where MRC students reside, Plaintiff was unable to participate in that program. He was moved into another building and away from his friends.   In addition, Plaintiff was prohibited from serving as a peer mentor, a program he had applied for and been accepted into to mentor incoming freshman. He was also told not to be in, or anywhere near the Mosher-Jordan Residence Hall.

51.   Complainant, on the other hand, remained in the Residence Hall with other MRC members, took on the role of peer mentor that Plaintiff had been removed from, and freely associated with all of her friends and the witnesses involved in the investigation.

52.   In spite of the required presumption of his innocence, during the phone call on August 6, 2012, Plaintiff was also directed not to be anywhere in the vicinity of the Complainant, which meant that he was also prohibited from being near other friends and fellow students; this interfered with his freedom to fully associate with others of his choosing.

14

53.   Upon information and belief Complainant was never similarly directed not
to be near Plaintiff.   The entire onus was placed on Plaintiff, and
Complainant was told to report Plaintiff to OSCR/OIE if he was in her
presence.

54.   The University has written policies and procedures in place governing
applicable investigative procedures and possible penalties that are to be
provided to "respondents." Plaintiff was not provided with a copy of any of
these documents until after his interview on August 6, 2012.

**Defendants Violated their Own Policies and Procedures
Guaranteeing Due Process**

55.   Defendants guarantee students involved in proceedings conducted through
OSCR/OIE certain protections and due process guarantees, aside from or
supplemental to those contained in the U.S. Constitution.  Below are some of
the guaranteed protections that Plaintiff was denied by Defendants:

From the OSCR "FAQ for Parents, Family, Attorneys, and Friends" :

a.   "Written notice of allegations against a student."

b.   "Sufficient time to prepare for an arbitration or other meeting."  [This
protection assumes there will be a hearing, an arbitration or meeting
of the parties; there was none.]

c.   "The opportunity to challenge the participation of a Resolution
Coordinator (RC), Resolution Officer (RO), or Student Resolution
Panelist for bias or other cause."

d.    "Knowledge of the names of witnesses who may provide information."

e.    "Access in advance to the information that may be considered during an arbitration [proceeding]."

f.    "The opportunity to pose questions to the RC, complainant or any witnesses."

g.    "The opportunity to hear/read all information presented at an arbitration [proceeding]."

h.    "In an arbitration [proceeding] all students are presumed not responsible unless clear and convincing evidence is presented that a violation of the Statement has occurred."

i.    There shall not be any "deprival of due process ... and no capricious clearly unreasonable or unlawful action imposed" by the university.

j.    Students have the right to be protected from capricious decision-making by the university ... students will not be deprived "of the appropriate due process protections to which they are entitled."

From the OSCR "Statement of Student Rights and Responsibilities" (July 13, 2013)

a.    "All complaints must be submitted to the RC, *in writing,* within six months.... (emphasis added)"

b.    "Hearing [Plaintiff specifically requested, but was denied, a hearing.] During the hearing, the ... respondent, ... [has] the right to question the complainant ... the RC...and any witnesses who have presented information ...[or] with information that is relevant to the case. ... "

c.    All parties may have access to all written or other information that will be considered ... including the names of witnesses providing information.

d.    "... An appeals process is an essential safeguard for an imperfect human process ... Appeals may be filed for the following reasons: ...

16

the evidence clearly does not support the finding(s), … or there is new evidence not reasonably available at the time of the hearing."

<u>From the Interim Procedure for Addressing Sexual Misconduct Allegations Against Students:</u>

a.    "… allegations of sexual misconduct are handled promptly and effectively in a manner that is procedurally fair to all parties."

b.    "… this will involve a thorough fact-finding investigation … and reviewing and analyzing relevant documents as they relate to each allegation …"

c.    "The investigation will address factual inaccuracies and misunderstandings, supported by evidence, identified by either party."

**Defendants' Investigation Into Complainant's Allegations Is Capricious, Reckless, Incomplete, Lacked Fundamental Fairness and Denied Plaintiff Due Process**

56.    Per the University's policy and procedure, the investigation and findings are to be concluded within sixty days of the date of the complaint; here, that date was to have been October 2, 2012.  That did not occur.

57.    On September 27, 2012, Plaintiff received Heather Cowan's typed summary of her verbal interview with him which took place on August 6, 2012.

58.    According to her "activity log" Heather Cowan interviewed four unnamed witnesses on August 8, August 10, August 23 and August 25, respectively.

59.    The witness interviews and the subsequent summaries thereof lacked any procedure to ensure they were credible, accurate and reliable.

17

60.    Plaintiff was never provided with the most basic information regarding these "witnesses" such as their names and what each one said.

61.    Plaintiff was not provided with any actual witness statements.

62.    No witness was asked to sign a statement.

63.    No witness was given the opportunity to review his or her statement. When one witness asked to review her statement, that request was specifically denied.

64.    No witness was given a copy or summary of his or her statement.

65.    No witness statement was recorded.

66.    No questions were presented to the witnesses in writing.

67.    No witness statement was affirmed or sworn to. With one exception, no contemporaneous record or documentation of any kind of any witness interview has been provided.

68.    Witness statements and interview notes were intentionally withheld from Plaintiff; he was required to rely on Cowan's purported "summary" of what was said by un-named witnesses.

69.    Witnesses were not advised in advance of the reason for the interview. Nor were they ever told that allegations had been made against Plaintiff. Rather, they were asked very simplistic questions with little or no follow up.

Inconsistencies in witness statements were never analyzed or followed up on.

70.     Witnesses were not provided with University policies or procedures relating to the investigation they were being asked to participate in.

71.     The witness interviews were not complete or thorough and were not designed to elicit information which would bring forth the truth.

72.     As one example, witness S.S., whose verbal interview statements were relied upon heavily by Defendants in their findings, later signed a sworn affidavit, provided to Defendants, which stated, in pertinent part:

a.      S.S. did not learn what or who the interview was about until it was well underway.

b.      S.S. was asked very general questions that were not probing and had no follow up.

c.      At her interview S.S. was not offered the opportunity to collect her thoughts in order to give her best, most complete accounting of the events at issue.

d.      S.S. was under considerable stress and duress during the interview and was offered no support by the investigator.

Defendants ignored the issues raised by S.S.

73.     As the investigator, Defendant Cowan knew or should have known of other important witnesses who would have relevant information to provide. She did not follow up with any of them.

19

74.    An obvious potential witness who was not contacted was L.C., a close friend and the Fall semester 2012 roommate of Complainant. L.C. subsequently stated in a sworn affidavit, provided to Defendants by Plaintiff, the following relevant information, which included a possible motive for a false accusation by Complainant:

a.    "In a conversation after July, 2012, … [Complainant] told me her mother searched [Complainant]'s room and found and read [Complainant]'s personal diary. In other conversations [Complainant] gave different accounts of how her mother came to find and read [Complainant]'s diary.   In each account, however, [Complainant] indicated that she kept a personal diary and that her mother had found and read the diary.   [Complainant] told me that the diary contained descriptions of romantic [and other] experiences."

b.    "After [Complainant] told me she had filed a complaint with OSCR, [Complainant]'s mother called my house.   … During that phone conversation with [Complainant]'s mother, I felt verbally harassed."

c.    "[Complainant]'s mother stated I was *living dangerously* and that I would be a *'bad friend'* if I did not 'stick up' for [Complainant]. [Complainant]'s mother called my house on three additional occasions … she said if Drew tries to contact you, you need *to contact me* because he is not allowed to talk about this.'"

d.    "[Complainant]'s mother's hostility and [Complainant]'s own awkwardness and mood swings caused me to decide I no longer wished to room with her."

e.    "I did not observe any change in [Complainant]'s demeanor or interactions with others from mid-March 2012 to the end of Winter term 2012.   The first time I saw a change in [Complainant]'s demeanor followed the July 2012 conversation described above. . . . It is my belief, based on my personal observations and conversations with [Complainant], that it is possible [Complainant] manufactured a story about a sexual assault in response to the conflict [Complainant]

20

<u>described occurring between her and her mother during the summer of
2012."</u> (emphasis added)

75.   Defendant Cowan missed this important evidence because she failed to
contact L.C. for an interview.   After Plaintiff obtained an affidavit from
L.C., no Defendant followed up with her; her important, sworn statement
was simply ignored by all Defendants.

76.   As noted above, a diary written by Complainant existed as of July 4, 2012,
the diary was found by Complainant's mother, and included information
about sexual encounters and other activities she engaged in; Complainant
did not reveal this information to Defendant Cowan but Plaintiff later told
Cowan about it. On information and belief the Defendants subsequently
learned that the diary was destroyed shortly after Complainant's mother
found it and questioned her about its contents.   Once Defendants learned
about the diary, Complainant was never questioned about it or this possible
spoliation of evidence.   Defendants never addressed or acknowledged this
issue.

77.   Additional witness information not included in Defendant Cowan's
investigation came from T.E., who was to have been Plaintiff's roommate
for Fall 2012, who verbally reported to OSCR and Defendant Cowan in
August 2012 the following information:

a.     T.E. was contacted by Complainant's mother in August 2012. She questioned him about whether he had heard from Plaintiff. When T.E. said "no" Complainant's mother told him that if he did hear from Plaintiff he should call her (the mother) first, before he called someone else.

b.     Defendant Cowan never followed up with T.E. to obtain a witness statement; nor did she include any reference to him in her report.

78.    The investigation was halted in September and October of 2012 because the Complainant was "uncertain" as to whether she should withdraw her allegation because of alleged concern over "respondent's access to draft and final report." Plaintiff was never so advised and was left in limbo, away from his Residence Hall and MRC, to wonder when the matter would be resolved.

79.    While the investigation was halted, on October 10, 2012, Plaintiff received an email from Defendant Cowan informing him that he had been seen near the Mosher-Jordan Residence Hall (he had walked with a friend to return the friend's bike to the bike rack). He was warned to avoid actions that would give "the appearance of being retaliatory contact." Defendant Cowan reminded Plaintiff to have no contact with the Complainant.

80.    Plaintiff responded to the email stating that he was concerned the University believed his being near a major residence hall could give an appearance of impropriety, and requesting that the investigation come to an end as "quickly and compassionately as possible for everyone involved."

**On November 5, 2012, Plaintiff Receives Cowan's "Summary of Witness Testimony and Review of Other Evidence." The Summary Is Incomplete, Reckless and Biased.  Plaintiff Immediately Files a Lengthy Response**

81.    The "Summary of Witness Testimony and Other Evidence" (the use of the term "witness testimony" is a misnomer; there was never any "testimony") produced by Defendant Cowan on November 5, 2012 is one page, but is the entirety of the investigation performed by Cowan over three months.  It is utterly confusing, and fails to provide context or background facts.  <u>No witness names are included.</u>  Cowan refers to things "witnesses" were allegedly told by Complainant, Plaintiff or other "witnesses" but includes no dates of those conversations.  It is literally impossible to discern who said what, when.

82.    Plaintiff responded to the Summary on November 9, 2012 providing five single-spaced pages of additional information, and listing concerns about key omitted facts and information, significant due process violations, and raising specific questions including the following:

a.      "… on August 6, 2012, … I was specifically advised that [I] would have the opportunity to review [Complainant's] completed interview statements and to review all other witness statements.  I have never been provided the opportunity to review these statements.  I formally request an opportunity to review the specific accusations against me and all witness statements."

b.      "It is difficult, if not impossible, to meaningfully and constructively respond to selected portions of witness statements."

c.    "Some explanation [from Complainant] for the delay and timing of the complaint is at least relevant …. Is the driving force behind this complaint the Complainant's mother?  There is reason to believe this is the case.  This may further provide the explanation for the filing of a complaint that is untrue."

d.    "The failure to investigate a motive for making the accusation, a failure to protect the integrity of the investigation and the failure to provide in the report the full context for the event being investigated deprives me of due process.  I ask that these due process issues be resolved."

e.    "I understand that the complainant now says that the sexual relationship was not consensual, that she said 'no'. I cannot state it more clearly that this is untrue.  I asked her if she wanted to have sex; she said 'yes.'"

f.    "If this was non-consensual … my roommate would have intervened. My roommate was awake during the event."

g.    "Why does the report … not include Complainant's April visit to my room and her apology and the discussion at that time?"

h.    "Why does the report include selected hearsay statements supportive of the Complainant and neglect to include hearsay statements supportive of me?"

83.    Plaintiff provided a paragraph by paragraph response/rebuttal to each alleged statement made by the un-named witnesses.

84.    Plaintiff concluded his Response by requesting that the Summary "be revised and amended to include all relevant information."

85.     On November 19, 2012, Defendant Cowan responded in a brief email which failed to substantively address any of Plaintiff's points and made clear she would be taking no additional steps.

86.     In an apparent effort to brush aside Plaintiff's substantive concerns, Defendant Cowan's November 19, 2012 email states, "Please note that all of your comments on the witness summaries will be considered as we finalize our review of this matter, and the full text of your comments can be appended to the final report if you wish."   This never happened.   Neither Cowan nor any other Defendant ever considered Plaintiff's comments on the witness summaries or anything else, nor were they "appended" to the final report.

**On November 20, 2012, Heather Cowan Issues her "Draft" "Sexual Misconduct Report."  It Demonstrates Recklessness and Denial of Due Process. This is Particularly So Given What is At Stake: The Ruination of Plaintiff's Educational, and Possibly His Professional Career**

87.     Defendant Cowan's Draft Report begins with an alleged "Summary" of Complainant's verbal complaint and of Plaintiff's verbal interview.   It next includes the problematic "Summary of Witness Testimony and Other Evidence" previously provided to Plaintiff, which was virtually identical to what is described above. Defendant Cowan made no changes or additions, in spite of Plaintiff's five page letter with corrections, due process concerns and a request for changes.

88.    Complainant and Plaintiff were provided with a copy of the Draft Report to review and comment on. The Report did not contain the "Findings" section, which was added five days later, and Plaintiff assumed that the "Draft" Report was a work in progress.

89.    Nonetheless, Plaintiff saw enough to understand that the document was woefully deficient, biased and a denial of due process. He promptly responded on November 25, 2012, with an email, again pointing out serious flaws, citing substantial additional relevant testimony and raising due process concerns.

90.    Plaintiff concluded his email with this statement: "I have two final points: First, due to the seriousness of the charges that have been made against me, and consistent with the concepts of due process and a chance to be fully heard, I am willing to testify under oath. Second, a conclusion based on unsworn statements is a flawed process and inconsistent with due process. Due process requires that those charges be made under oath and that I or my representative have a right to cross-examine anybody making such allegations."

91.    Defendant Cowan never substantively responded to a single point made by Plaintiff, never addressed his request to be heard, and never lifted a finger to change or improve her report.

92. In fact, Defendant Cowan had made her mind up early on, based solely on Complainant's meeting with her, that Plaintiff was "guilty." The result of her investigation was pre-ordained and she devoted very little time or energy to seeking facts.

93. Plaintiff's plea that due to the seriousness of the charges against him he be allowed to testify under oath and to be heard went unanswered by any Defendant.

**On November 30, 2012, OSCR Issues its Final "Sexual Misconduct Investigation Report" Written by Heather Cowan. It is Virtually Identical to the Deeply Flawed Draft Report, but Now Contains a Section Titled "Analysis of Evidence and Finding of Facts"**

94. In the Final Report, Defendant Cowan made the following Findings:

"it is determined that the Respondent engaged in sexual intercourse with the Complainant without her consent and that that activity is so severe as to create a hostile environment. The Respondent's behavior therefore constitutes sexual misconduct as outlined in the 'Interim Procedure.' As such, it is determined that the Respondent is responsible for subjecting the Complainant to sexual misconduct in violation of University policy."

95. The final Report is virtually identical to the Draft with regard to the evidence summarized, with all of the flaws and deficiencies described above.

96. Defendant Cowan had ignored all of the information provided by Plaintiff on November 9 and November 25, 2012.

97. In fact, Defendant Cowan hid Plaintiff's comments and concerns. While she did attach Plaintiff's five page November 9 letter to the final report, she

unilaterally redacted most of it, inexplicably declaring it to be not "relevant," noting at the top of the letter "Redacted for Relevance" (emphasis added).

98.   Defendant Cowan's "Findings" are without any coherent, credible foundation, much less supported by a preponderance of the evidence.

99.   The "evidence" she relies on is hearsay, and double hearsay, from unnamed witnesses on unknown dates.

100.   It would have been impossible for Defendant Cowan to conclude under the circumstances that Plaintiff had engaged in sexual misconduct "by a preponderance of the evidence" absent complete recklessness, and bias.

101.   Defendant Cowan picked out one hearsay witness statement in particular as the basis for her findings against Plaintiff, despite the reality that the facts contained in that witness statement were 100% inconsistent with the Complainant's own version of what occurred.

102.   Moreover, Cowan's findings were based almost entirely on a complete falsehood: that Plaintiff had NOT specifically denied to an unnamed witness (later learned to be S.S.) that Complainant had said "no."

103.   It is uncontested that Plaintiff had continually stated from his first contact with Cowan, that Complainant never said no.   One example was his November 9 letter to Cowan: "I understand that the Complainant now says that the sexual relationship was not consensual, and that she said 'no.'   I

28

cannot state it more clearly that this is untrue.  I asked her if she wanted to have sex:  She said, 'yes.'"

104.  It is also uncontested that Plaintiff challenged, in writing, the credibility and truthfulness of the unnamed witness.

105.  This fiction of Cowan's that Plaintiff had not denied that Complainant said "no" was adopted without question or analysis by all Defendants, even after the witness relied upon for this finding, S.S., later submitted an affidavit to the contrary.

106.  Cowan also relied heavily for her findings of sexual misconduct on a completely irrelevant point – that Plaintiff said he "regretted" having had sex with Complainant.

107.  Cowan illogically concluded that "regret" meant Plaintiff knew the sex was not consensual.

108.  Cowan knowingly ignored the obvious – which was explained to her by Plaintiff – that he regretted having sex with a friend.

109.  The Report contains statements attributed to witnesses the witnesses subsequently denied in affidavits.

110.  The Findings in the Report draw all inferences in the light most favorable to Complainant, are biased against Plaintiff, and are flat out wrong.

111. Defendant Cowan's "analysis and findings" also misstate or contradict the record <u>she</u> created.

112. Cowan's Report deliberately hides the statements of Plaintiff's roommate, Z.L., as described below.

113. On August 6, 2012, Cowan stated that the roommate Z.L. was "the most important witness." Cowan interviewed him on August 8, 2012, giving him no advance notice of what the interview was about, and never telling him that a complaint had been made against Drew Sterrett. There is no record of what questions were asked of Z.L. or what his answers were.

114. Inexplicably, however, Cowan omits any reference of Z.L. in her "Summary of Witness Testimony and Review of Other Evidence" dated November 5, 2012, her "Draft Report" dated November 20, 2012, or even in her discussion of "Witness Testimony" included in her Final Report of November 30, 2012.

115. Rather, the only place Cowan's August 8, 2012 interview of Z.L. is referenced is in the "Analysis of Evidence and Finding of the Fact" section of the Final Report, where she uses his statement only as a mechanism to suggest that Plaintiff is lying:

"The Respondent reported that his roommate told him he was awake during the entire encounter with the Complainant. The roommate reported that he was asleep during the entire encounter and knew only that the Complainant had stayed the night. The roommate additionally reported that even if he

had been awake during the encounter, he would not be able to share any information as he may not have been able to hear anything from the top bunk."

116.   Cowan's statement in her Report of what the roommate told her on August 8, 2012, is false.  Z.L. never told Cowan "he was asleep during the entire encounter …", and he subsequently submitted an affidavit affirming that. Defendants ignored the affidavit.

### Plaintiff is Stunned by the Results of the Sexual Misconduct Report and Attempts to Set the Record Straight; Defendants Refuse to Consider New or Corrected Information

117.   The November 30, 2012 Report and Findings confirmed Plaintiff's worst fears:  The investigation and findings were pre-ordained and a complete denial of due process.  In an effort to salvage his future, he took it upon himself to produce evidence of the truth.

118.   On December 6, 2012, Plaintiff met with OSCR Associate Director Stacy Vander Velde.  He told Vander Velde that he was innocent and a terrible mistake had been made.

119.   On December 11, 2012, Plaintiff's representative sent a seven page letter to Defendants identifying significant shortcomings in the investigation and denials of due process.  Included was information that Defendant Cowan had been incorrect in stating that his roommate Z.L. had been "asleep the entire time," and that in fact Z.L. had sent an electronic message to Plaintiff in the

31

midst of the sexual encounter in the bunk below him, complaining about the noise Plaintiff and Complainant were making.

120. OSCR responded on December 18, 2012 that it would be referring the issues raised by Plaintiff regarding Defendant Cowan's flawed investigation back to Cowan.

121. Cowan re-interviewed Z.L. on December 18, 2012.

122. On January 8, 2013, Cowan issued an "Addendum to Sexual Misconduct Investigation Report Issued November 20, 2012," addressing her second interview with Z.L. In it, Defendant Cowan's defensiveness is apparent. She blames Z.L. for the inadequacy of her initial interview, and absolves herself of any responsibility for not gathering complete information.

123. The Addendum quotes Z.L. as stating the following, in part, during the second interview:

   a.   Z.L. was "4 feet away" and if there was any talking between Plaintiff and Complainant he definitely would have heard it.

   b.   He did not hear Complainant say, "no," "wait," or "stop" and if he had heard that he "would have intervened."

   c.   If Complainant had said, "no" she didn't say it loud enough to ask for help from him because "she knows I would have helped her."

   d.   In the midst of the sexual encounter, Z.L. grabbed his computer from the top of his dresser and sent Plaintiff a Facebook message complaining about his sleep being disturbed but that he did not want to "embarrass you all" by saying anything.

124. Cowan never followed up with Z.L. to get a copy of the Facebook message; it was later provided to her by Plaintiff.

125. Based upon the interview of Z.L. and his Facebook message, the sexual encounter between Plaintiff and Complainant on March 17, 2012 could not have reasonably been construed by anyone to have been non-consensual by a preponderance of the evidence.

126. Instead of reaching this clear and obvious conclusion, Defendant Cowan inexplicably found in the Addendum that the new eyewitness sworn statement "does not alter the conclusion reached in the Report from November 30, 2012," a reckless conclusion defying all logic and common sense.

127. Rather, while essentially rejecting every substantive point made by Z.L., the only third party eyewitness, Defendants latched onto his comment that he believed Complainant was intoxicated earlier that night. Based on that statement, Defendant Cowan then created an entirely new, unsubstantiated basis for finding sexual misconduct by the Plaintiff – that "a reasonable person in similar circumstances would have been aware that Complainant was not coherent enough to provide valid consent for sexual activity."

128. The new finding against Plaintiff had never been previously raised with him; he was never given notice, had never been presented with the allegation and never had a chance to respond to it in any way.

129. This new finding was evidence of bias and recklessness on the part of Defendant Cowan; the basis for her original finding was not supportable so she simply made up a brand new "finding".

130. Moreover, Defendant Cowan reached the conclusion that the Complainant was "intoxicated" and that Plaintiff should have been aware of it, even though she had <u>never asked Complainant whether she was intoxicated</u>, how much alcohol she had consumed or whether she was coherent enough to provide consent.

131. On January 17, 2013, Plaintiff's counsel sent another letter to OSCR outlining the flaws in the investigation and the denial of due process. There was no substantive response.

132. After the incorrect and incomplete Report and Findings, Plaintiff later submitted multiple affidavits to correct the record and supply important evidence missed by Cowan, including:

   a.   A detailed affidavit from his roommate, Z.L., providing specific exculpatory information.

   b.   His own eight page affidavit providing additional information directed at the findings made against him.

c.   An affidavit from a close friend and roommate of Complainant's, L.C. Some of the content of her affidavit is described above, and clearly stated that Complainant was likely not telling the truth, and had a motive to lie. This new, sworn information was ignored by Defendants.

d.   An affidavit from a friend of Complainant's, S.S., a witness who had been previously interviewed by Defendant Cowan. In fact, S.S. was the witness Defendant Cowan largely relied on for her original findings against Plaintiff. As described above, S.S. confirmed in a sworn statement that Defendant Cowan's interview placed S.S. under great duress and that she was unable to give thoughtful or complete answers. S.S. also made clear that Cowan's reliance on her statement that Plaintiff had told her that Complainant had said "no" was false; in fact Plaintiff "never" told S.S. he had engaged in any "act of sexual misconduct" with Complainant. This sworn statement was ignored by Defendants.

e.   An affidavit from witness J.T. providing yet more exculpatory information which Defendants knew or should have known about from the onset of their investigation. J.T. stated that Complainant was "tipsy" [not intoxicated] the night at issue and that the statements previously attributed to him by Defendant Cowan were false.

**There is No Appeal of the Fact Finding Decision Against Plaintiff**

133.   The OSCR/OIE policy and practice was that the same person, Heather Cowan, would:

a.   Personally meet with Complainant when she appeared to make a complaint;

b.   Decide what to investigate, what evidence to seek and who to interview;

c.   Perform the investigation;

d.   Report the results of the investigation; and,

35

e.     Create the Report and Findings of Fact.

134.   There was no appeal allowed of Cowan's factual findings or conclusions.

**Defendants Proceed with Discipline Against Plaintiff in Spite
of Evidence of A Capricious And Deeply Flawed Investigation and No
"Preponderance of the Evidence"**

135.   Based on the Cowan Report, on January 10, 2013, Defendant Vander Velde
       provided Plaintiff with a Proposed "Resolution Agreement" decided upon by
       Defendants Malinda Matney and Laura Blake-Jones, asking him to agree to
       be suspended from the University effective immediately until, at the earliest,
       May 1, 2016, at which time, if the University decided to re-enroll him, he
       would be placed on disciplinary probation for another year, among other
       things. Defendant Wilgus acknowledged that the sexual misconduct finding
       would remain permanently on Plaintiff's educational record and would
       likely limit his educational, employment and career opportunities.

136.   Defendants Matney, Blake-Jones and others failed and refused to consider
       the lack of evidence and illogical conclusions reached by Cowan or any of
       the evidence that had been submitted after Cowan's Report and Findings
       were issued.

137.   Based upon the fact that he had not engaged in any misconduct, Plaintiff
       declined to agree to the proposed "Resolution Agreement" which would
       require him to admit to "sexual misconduct."

138. On February 1, 2013, Plaintiff received Defendant Dean of Students Royster Harper's decision upholding Cowan's Report and Findings, and issuing sanctions against Plaintiff, which suspended him until July 2016 at the earliest, among other sanctions.

139. Defendants Matney, Jones and Harper approved the sanctions without any analysis and ignored the due process violations.

**Plaintiff Appeals. The Appeals Board Denies Plaintiff Due Process**

140. On May 15, 2013, Plaintiff submitted his Appeal to the Appeals Board. The Appeal was limited to 1) whether there had been a material deviation from written procedures that substantially affected due process, 2) whether the sanctions were appropriate, 3) whether there was new evidence that could have reasonably affected the finding(s)s of the Report.

141. Plaintiff's Appeal presented a detailed statement proving that Defendants' findings were biased, were not properly arrived at, materially deviated from written procedures, lacked fundamental fairness, were reckless, and substantially affected due process.

142. Plaintiff also submitted four Affidavits from witnesses with new, relevant information which could have reasonably affected the findings of the Report.

143. In addition, Plaintiff submitted a one and a half page document titled "Request to be Heard and make an Oral Presentation to the Appeals Board"

in which Plaintiff asked to be allowed to make a presentation and answer questions under oath.

144.   Plaintiff's request to appear before the Appeals Board was denied.

145.   Inexplicably, the Appeals Board found that the "new" witness affidavits (which contained information which Defendant Cowan should have found as part of her initial investigation) presented no new factual or probative information, even though they clearly did, that they were "speculation" and "conflicted."   With regard to the earlier statements collected by Cowan, the "conflict" was resolved this way:   the Board accepted Defendant Cowan's "Summary" of un-named, un-sworn witness statements and outright rejected the sworn affidavits of named witnesses who took the position that Cowan's interviews were incomplete or wrong, even as the Appeals Board acknowledged in their report "the inconsistency of testimonies and the University's inability to know definitively what happened."

146.   The Appeals Board was obviously biased against Plaintiff based on his gender, and invested in supporting the findings of their University colleagues.

147.   The decision of the Appeals Board was a rubber-stamp of the flawed investigation and Report and Addendum, lacked fundamental fairness, was reckless, arbitrary and capricious, and clearly denied Plaintiff due process.

148. The Appeals Board amended the sanctions issued against Plaintiff and lessened the period of suspension.  Nonetheless, in order to return to the University, Plaintiff would have to admit to sexual misconduct, and agree to sanctions, which would remain permanently on his record.  He did not do so.

### Plaintiff's Current Standing With the University

149. Plaintiff's official status with the University is currently that he is not in good standing and has engaged in a violation of the University's sexual misconduct policy.

150. Plaintiff likely will be unable to be admitted to any other university given his status.

151. Defendants' false findings against Plaintiff are quasi-criminal in nature: that he has engaged in a sexual assault of a student.

152. Plaintiff cannot re-enter the University without agreeing that he engaged in sexual assault and accept sanctions, among other requirements.

153. The violations of Plaintiff's constitutional and statutory rights are of a continuing nature, and are ongoing.

### COUNT I
### *42 U.S.C. § 1983 - Fourteenth Amendment Due Process*
*(as against all Defendants other than the Regents of the University of Michigan; for money damages in their personal capacities and for injunctive relief in their official capacities)*

39

154. Plaintiff repeats and realleges Paragraphs 1 through 153 set forth above with the same force and effect as though set forth in full herein.

155. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

156. Fourteenth Amendment due process protections are required in higher education disciplinary decisions.

157. A person has a protected liberty interest in his good name, reputation, honor and integrity which he cannot be deprived of by the state absent due process.

158. A person has a protected liberty interest in pursuing his education, as well as future educational and employment opportunities and occupational liberty, which the state cannot deprive him of absent due process.

159. A person has a protected property interest in his education, which the state cannot deprive him of without affording him of absent due process.

160. Plaintiff Sterrett had a constitutionally protected liberty interest in his good name, reputation, honor and integrity.

161. Plaintiff Sterrett had a constitutionally protected liberty interest in pursuing his education, as well as future educational and employment opportunities.

162. Plaintiff Sterrett had a constitutionally protected property interest in continuing his education at the University of Michigan.

40

163. Plaintiff Sterrett was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing. Here the allegations were of the utmost seriousness, have lifelong ramifications and are quasi-criminal in nature.

164. Plaintiff Sterrett was entitled to fundamentally fair procedures to determine whether misconduct occurred.

165. Regardless, Plaintiff was disciplined, suspended and sanctioned by Defendants, depriving him of his liberty and property interests, without being afforded basic due process, including but not limited to notice of the allegations against him and an opportunity to be heard.

166. Plaintiff was denied notice of the allegations against him when he was interviewed via Skype on August 6, 2012, which deprived him of the opportunity to prepare and fully respond. Thus, Plaintiff was denied the opportunity to be heard in any meaningful way.

167. Plaintiff was never afforded any type of hearing, much less a meaningful hearing providing him with the opportunity to respond, explain and defend.

168. Plaintiff never received written notice of the charges against him.

169. Nor did Plaintiff ever receive verbal notice of the specific charges against him.

170. Plaintiff received nothing in writing by the Complainant.

171. Plaintiff was not allowed to confront, much less cross-examine, his accuser, or to have a third party do so.

172. Plaintiff was never provided with a list of witnesses until after the findings had been issued.

173. Plaintiff was never provided with any witness statements.

174. Plaintiff was denied a prompt, thorough and impartial investigation.

175. Plaintiff was denied a meaningful opportunity to clear his name.

176. Plaintiff's liberty and property interests were invaded by Defendants in an arbitrary and irrational manner.

177. Defendants acted with deliberate indifference to Plaintiff's presumed and actual innocence.

178. Additional procedures would have proven that the misconduct at issue had not occurred.

179. Defendant Cowan, with the approval of Defendants Vander Velde and Wilgus, conducted an investigation that was reckless and grossly negligent.

180. Defendant Cowan was the sole investigator, and finder of fact and decision maker.

181. Defendants Vander Velde, Wilgus, Walesby, Matney, Blake Jones, and Harper created a policy, pattern and practice which deprived Plaintiff of any appeal of the Cowan findings and decision, further failed to ensure training

42

of Cowan and her superiors in the legal and appropriate methods of investigating allegations of sexual misconduct.

182. Defendants agreed to, approved and ratified this unconstitutional conduct.

183. It would have been plainly obvious to a reasonable official actions or inaction would deprive or lead to the deprivation of Plaintiff's constitutional rights.

184. Defendants had a custom and practice of disregarding and violating students' constitutional rights.

185. Defendants had a custom and practice of failing to afford basic due process protections to students accused of quasi criminal sexual misconduct

186. Defendants' actions and inaction as set forth above were fundamentally unfair to Plaintiff.

187. Defendants' actions and inaction in the above matter were unduly prone to false findings of sexual misconduct.

188. Defendants' actions were arbitrary and capricious.

189. Defendants' conduct was so egregious as to shock the conscience.

190. There exists no rational relationship between Plaintiff's actual conduct and the discipline imposed against him by Defendants.

191. In depriving Plaintiff of his constitutionally protected rights, including his liberty interest in his good name, reputation, honor and integrity, opportunity

to pursue education and employment; and his property interest in his education, Defendants violated Plaintiff's right to due process of law in violation of the Fourteenth Amendment to the United States Constitution.

192. Defendants Cowan, Wilgus, Vander Velde, Spencer, Pritzel, Senja, Harper, Matney, Walesby and Jones, and other agents, representatives, and employees of the University of Michigan acting under color of state law and in concert with one another, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

193. At all times material hereto, Plaintiff had a clearly established right to due process of law of which a reasonable public official would have known.

194. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered  irreparable harm, injury, and damages, including but not limited to removal from his housing and the MRC community, denial of educational opportunities within the MRC community, including the ability to be a peer mentor; course enrollment limitations; suspension; placement on disciplinary probation for having engaged in "sexual misconduct"; a "not in good standing" designation restricting, if not destroying, future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on Plaintiff's record for serious sexual misconduct which did not occur; damage to Plaintiff's

44

standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT II
### *42 U.S.C. §1983 - First Amendment Free Speech*
*(as against Defendants Cowan Vander Velde and Wilgus for money damages in their personal capacities and for injunctive relief in their official capacities)*

195. Plaintiff repeats and realleges Paragraphs 1 through 194 set forth above with the same force and effect as though set forth in full herein.

196. At all times material hereto, Plaintiff had a clearly established right to freedom of speech pursuant to the First Amendment of the United States Constitution, of which a reasonable public official would have known.

197. Plaintiff's free speech rights included the right to freely speak with fellow students in a public university setting, including those whose testimony was critical to Plaintiff's ability to counter and refute the serious, false and quasi-criminal allegations for which he was under investigation.

198. Defendants specifically prohibited Plaintiff from engaging in protected speech with these witnesses, in violation of Plaintiff's First Amendment rights.

199. Defendants' actions would deter a person of ordinary firmness from exercising First Amendment rights and have a chilling effect on the exercise of First Amendment rights.

200. The speech prohibited by Defendants would have neither substantially disrupted school activities nor impinged on the rights of other students.

201. Defendants Cowan, Vander Velde and Wilgus, and other agents and employees of the University of Michigan acting under color of state law and in concert with one another, by their conduct in prohibiting Plaintiff from speaking with fellow students and witnesses showed intentional, outrageous and reckless disregard for Plaintiff's constitutional rights.

As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered  irreparable harm, injury, and damages, including but not limited to removal from his housing and the MRC community, denial of educational opportunities within the MRC community, including the ability to be a peer mentor; course enrollment limitations; suspension; placement on disciplinary probation for having engaged in "sexual misconduct"; a "not in good standing" designation restricting, if not destroying, future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on Plaintiff's record for serious sexual misconduct which did not occur; damage to Plaintiff's

46

standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT III**

***20 U.S.C. §1681 – Sex Discrimination in Violation of Title IX***
*(as against the Regents of the University of Michigan), and **MCLA** 37.2402 (as against all Defendants)*

203.   Plaintiff repeats and realleges Paragraphs 1 through 202 set forth above with the same force and effect as though set forth in full herein.

204.   Defendants are a recipient of federal funds and are subject to Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §1681, et seq., 34 C.F.R. §106.31.

205.   As such, Defendants are prohibited from engaging in sex discrimination, including discrimination on the basis of sex under Title IX, which provides, "No person in the United States shall, on the basis of sex, be [1] excluded from participation in, [2] be denied the benefits of, or [3] be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1691(a).

206. MCLA 37.2402 prohibits discrimination on the basis of sex in the full utilization or benefit of, or the services, activities or programs provided by the institution.

207. Defendants' agents failed to provide Plaintiff with the full benefits and services of and excluded him from participation in and discriminated against him with regard to programs, services and/or activities the basis of his sex.

208. From the onset, the investigation by Defendants' agents was biased against Plaintiff because of his sex, due in part to the perceived "epidemic" of sexual assaults on females by males on college campuses.

209. In discriminating against Plaintiff on the basis of his sex, Defendants were responding in part to a 2011 "Dear Colleague" letter from the U.S. Department of Education stating that acts of sexual violence "are vastly underreported" and that "[w]hen young women get to *college*, nearly 20% of them will be victims of attempted or actual sexual assault" (a now highly disputed and extrapolated figure, which came from a limited 2007 study).

210. Based on Plaintiff's gender there was a rush to judgment against him, in spite of the evidence and facts, leading to an erroneous outcome.

211. Defendants' agents were predisposed to discriminate against Plaintiff in a sexual misconduct investigation on the basis of his sex.

212. The actions of Defendants were intentional, in deliberate indifference to the rights and sensibilities of Plaintiff.

213. The actions of Defendants were intentional, and in deliberate indifference to the discovery of the truth and the correct outcome of the investigation.

214. Defendants failed to adequately train their agents on sexual misconduct investigations and due process and non-discrimination procedures.

215. Defendants treated Plaintiff differently and less favorably with respect to his rights during the investigation on the basis of his sex, as compared to his female accuser.

216. Defendants treated Plaintiff differently and less favorably on the basis of his sex with regard to how the "findings" against him were arrived at.

217. Defendants intentionally treated Complainant preferentially on the basis of her sex by adopting without question all of her statements as correct, even where they were illogical or inconsistent with statements of witnesses and Plaintiff. Defendant ignored all evidence exculpatory to Plaintiff.

218. Defendants "findings" were based on a pre-ordained desire and plan to adopt Plaintiff's allegations on the basis of gender.

219. Defendants intentionally ignored the requirement that the Complainant carried the burden of proof and instead shifted it to Plaintiff, on the basis of his gender.

220. Defendants violated its own self-created, lowered standard of proof of by "a preponderance of the evidence," finding against Plaintiff in spite of the fact that the evidence did not meet this standard, on the basis of Plaintiff's gender.

221. As a direct result of its discriminatory practices, Plaintiff was denied adequate notice, and a fundamentally fair opportunity to be heard, and an erroneous outcome was reached.

222. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including but not limited to, monetary damages, loss of his undergraduate education opportunity, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment; and loss of personal and professional reputation.

### **Relief Requested**

Plaintiff demands judgment against Defendants as follows:

A.   Legal Relief:

     1.   Compensatory damages in whatever amount he is found to be entitled;

     2.   Exemplary damages in whatever amount he is found to be entitled;

     3.   Punitive damages in whatever amount he is found to be entitled; and,

4.    An award of interest, costs, reasonable attorney fees, and expert witness fees.

B.    Equitable Relief:

1.    Removal from Plaintiff's files and records of any and all references to the allegations or investigation at issue, discipline or sanctions;

2.    Reinstatement to the University of Michigan as a student in good standing;

3.    An injunction out of this Court prohibiting any further acts of wrongdoing or retaliation against Plaintiff;

4.    An award of interest, costs and reasonable attorney fees; and,

5.    Whatever other equitable relief appears appropriate at the time of final judgment.

> **DEBORAH GORDON LAW**
> **Gordon, Laughbaum & Prescott**
> /s/Deborah L. Gordon (P27058)
> Carol A. Laughbaum (P41711)
> Attorneys for Plaintiff
> 33 Bloomfield Hills Parkway, Suite 220
> Bloomfield Hills, Michigan 48304
> (248) 258 2500
> dgordon@deborahgordonlaw.com
> claughbaum@deborahgordonlaw.com

Dated:  July 2, 2014

## JURY DEMAND

Plaintiff **Drew Sterrett** by his attorneys **Deborah Gordon Law** demands a trial by jury of all the issues in this cause.

**DEBORAH GORDON LAW**
**Gordon, Laughbaum & Prescott**
/s/Deborah L. Gordon (P27058)
Carol A. Laughbaum (P41711)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258 2500
dgordon@deborahgordonlaw.com
claughbaum@deborahgordonlaw.com

Dated:  July 2, 2014